UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUDY WILKINS,

            Plaintiff,

      v.

DR. MARIA MAGAT, et al.,

            Defendants.

Case No. 15-cv-01706-YGR (PR)

**ORDER GRANTING DEFENDANTS'
SECOND MOTION FOR SUMMARY
JUDGMENT; AND DENYING THEIR
MOTION TO STRIKE AS MOOT**

## I.    INTRODUCTION

Plaintiff Rudy Wilkins, a state prisoner currently incarcerated at San Quentin State Prison ("SQSP"), brought this *pro se* civil rights case under 42 U.S.C. § 1983.  The operative complaint is the second amended complaint, in which he seeks monetary damages.  *See* Dkt. 15-2 at 11.[1]  He alleges constitutional violations during his previous incarceration at Santa Rita Jail ("Santa Rita") in Alameda County from November 2013 to October 2015, when he was transferred to SQSP.  Dkt. 15 at 7-11; Dkt. 15-1 at 1-11; Dkt. 15-2 at 1-5.  Plaintiff specifically alleges a claim of deliberate indifference to serious medical needs against Santa Rita physicians stemming from inadequate treatment or accommodations relating to his: (1) skin issues; (2) arthritis; (3) hernia; and (3) shoulder or clavicle injuries.  *See id.*; *see also* Dkts. 140, 140-1.  The alleged constitutional violations at Santa Rita ended in October 2015, when Plaintiff was transferred to SQSP.

In an Order dated February 3, 2016, Magistrate Judge Laurel Beeler found that Plaintiff's allegations in his second amended complaint stated a cognizable Eighth Amendment claim for deliberate indifference to serious medical needs.  Dkt. 18.

Before the Court is Defendants' second motion for summary judgment, in which they claim that Plaintiff's allegations failed to support a finding of deliberate indifference to his serious medical needs.  Dkt. 124.  For reasons discussed below, the Court GRANTS Defendants' second motion for summary judgment.

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

## II.    BACKGROUND

### A.    Procedural Background and Defendants' Pending Motion to Strike

On April 16, 2005, Plaintiff filed his original complaint, asserting claims about skin-irritating liquid soap and the denial of cold weather clothing at Santa Rita.  Dkt. 1.

On May 13, 2015, Magistrate Judge Beeler reviewed the complaint and dismissed it with leave to file an amended complaint.  Dkt. 5.

Plaintiff then filed two different amended complaints.  Dkts. 7, 8.

On July 1, 2015, Magistrate Judge Beeler issued an order describing the confusion created by the arrival of two different complaints and requiring Plaintiff to file one second amended complaint asserting all his claims in a coherent manner.  Dkt. 9.

On November 20, 2015, Plaintiff filed his second amended complaint after being granted two extensions of time to do so.  Dkts. 15, 15-1, 15-2.[2]

On February 3, 2016, Magistrate Judge Beeler reviewed the second amended complaint, and determined that, liberally construed, it stated cognizable claims against Defendants Dr. Maria Magat, Dr. I-Fei Chen, Dr. Glenda Newell[3] and Dr. Khin Tha for "Eighth Amendment violations based on their alleged deliberate indifference to [Plaintiff's] need for treatment of his skin condition, need for adequate primary care, and need for chronos[4] for closed-toe shoes and cold-weather clothes."  Dkt. 18 at 5 (footnote added).  Magistrate Judge Beeler dismissed Plaintiff's claims against Defendant Magat for disclosure of his medical information to the inmate appeals division and against Sergeant Dixon for providing the liquid soap that caused the skin irritation for which Plaintiff sought medical care.  Id. at 5-6.  Finally, Magistrate Judge Beeler determined that all other claims should be dismissed as improperly joined with his medical care claims against the four doctors.  Id. at 6-8 (citing Fed. R. Civ. P. 20(a)).  The dismissal of the improperly joined

---

[2] Plaintiff's second amended complaint is a lengthy document, which was scanned into multiple parts within Docket No. 15 of the Court's electronic filing system.

[3] The Court notes that Defendant Newell is also known as Dr. Glenda Newell-Harris.  See Magat Decl., Ex. A at 46.

[4] A "chrono" is a form that allows prisoners to request certain medical accommodations as deemed necessary by medical staff.

defendants was without prejudice to Plaintiff filing new actions asserting claims against the dismissed parties. *Id.* at 8.

Although Plaintiff had consented to proceed before a magistrate judge, *see* Dkt. 1 at 4, Defendants did not consent to proceed before a magistrate judge, *see* Dkt. 25. Therefore, this action was reassigned to the undersigned judge.

Thereafter, Defendants filed their first motion for summary judgment, and Plaintiff filed various motions, including several discovery matters. Dkts. 29, 43, 51, 52, 65, 84.

On June 2, 2017, the Court referred this case to Magistrate Judge Nandor J. Vadas for all discovery matters. Dkt. 94. The Court then denied Defendants' motion for summary judgment without prejudice to refiling after the resolution of the discovery disputes. *Id.* at 3.

Thereafter, Magistrate Judge Vadas resolved several of the discovery matters as well as Plaintiff's pending motions. *See* Dkts. 95, 96, 105. Any efforts by Plaintiff to recall Magistrate Judge Vadas's ruling were denied. *See* Dkt. 117. However, there were still some remaining discovery disputes, which were then referred to Magistrate Judge Robert M. Illman. *See id.* Magistrate Judge Illman then resolved all remaining discovery disputes. Dkt. 122.

On May 9, 2018, Defendants filed their second motion for summary judgment. Dkt. 124. The instant motion was brought on the grounds that: (1) Plaintiff's claims are "untenable as a matter of law due to the absence of genuine disputes regarding their requisite elements"; (2) the undisputed evidence confirms: (a) Defendants invariably met the standard of care, (b) Plaintiff never faced any excessive health risk, (c) no Defendant perceived or disregarded any excessive health risk, and (d) no Defendant caused harm; and (3) Plaintiff had not exhausted his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), with respect to his theories of inadequate shoulder, hernia, and clavicle care. Dkt. 124 at 7.

Plaintiff filed an opposition. Dkt. 140.

Defendants filed a reply, dkt. 141, and a motion to strike certain arguments from Plaintiff's opposition "to the extent he purports them to qualify as parts of a declaration . . . because he offers them in violation of both local rule and Federal Rule of Civil Procedure 56," *id.* at 6. Specifically, Defendants argue these arguments should be stricken "because they are replete with

conclusions, arguments, and matters not based on personal knowledge and matters which he is not competent to testify." *Id.* Defendants also move to strike exhibits A through E attached in support of Plaintiff's opposition because they were "not properly authenticated." *Id.* First, the federal rules of evidence provide that a witness may make any statement from his own personal knowledge. *See* Fed. R. Evid. 602. If any of Plaintiff's statements were not based on his personal knowledge or were not relevant to the issues, the Court has not considered them. Second, the Court concludes that even if any of Plaintiff's supporting documents were admitted and accepted at face value, Defendants still would be entitled to judgment as a matter of law, as set forth below. Although some of the documents in question are discussed in its analysis, the Court also points out that such evidence is not sufficient to defeat summary judgment. Accordingly, Defendants' Objections to Putative Evidence and Request to Strike is DENIED as moot.[5] Dkt. 141.

### B. Factual Background

#### 1. The Parties

At the time of the events set forth in his second amended complaint, Plaintiff was incarcerated at Santa Rita. *See* Dkt. 15 at 4. Also, during the time frame at issue, Defendants Magat, Chen, Newell, and Tha were physicians at Santa Rita. Magat Decl. ¶ 1; Chen Decl. ¶ 1, 3; Newell Decl. ¶ 1, 3; Tha Decl. ¶ 1. Defendant Magat also held the title of Acting Medical Director during this time frame.[6] Dkt. 15 at 4.

#### 2. Plaintiff's Version

The following background, which summarizes Plaintiff's allegations in his second amended complaint, is taken from Magistrate Judge Beeler's February 3, 2016 Service Order:

> In his second amended complaint, Mr. Wilkins alleges the following about events that occurred while he was an inmate at Santa Rita Jail, during which time he was "a convicted inmate." (ECF No. 15 at 5.)

---

[5] Because the Court has denied as moot Defendants' Objections to Putative Evidence and Request to Strike, Plaintiff need not file a response to Defendants' request.

[6] Defendant Magat is currently serving as Medical Director of Santa Rita and Glenn E. Dyer Detention Facility. Magat Decl. ¶ 1.

Medical care providers did not adequately respond to Mr. Wilkins's medical needs in November 2013 and later. Dr. Maria Magat, Dr. F. Chen, Dr. G. Newell, and Dr. [Khin Tha][7] denied Mr. Wilkins (1) closed-toe shoes for four months, (2) cold weather clothing for more than twelve months, (3) treatment for an irritating skin condition for thirteen months, and (4) adequate primary care (including refilling pain medications) for twenty-three months. (*See* ECF No. 15 at 10-11; ECF No. 15-1 at 1-3, 10-11; ECF No. 15-2 at 1-4.) The denials of the needed closed-toe shoes and cold weather clothes occurred even though Mr. Wilkins told the doctors of painful swelling in his joints and bones that resulted from the cold and rainy weather he experienced when going to court. The denials of the adequate skin care occurred even though he "suffered from skin irritation," "marks, spots" and scars which caused him emotional distress and caused him to suffer from obsessive-compulsive disorder. (ECF No. 15-1 at 2-3.) Dr. Magat also failed to properly train the other doctors to "ensure that they do not use inhumane treatment and delay or den[y] needed medical treatments." (ECF No. 15-2 at 5.)

Mr. Wilkins's skin problems started when the jail switched from bar soap to liquid soap during his incarceration. Sergeant Dixon oversaw the jail commissary. On February 28, 2014, Mr. Wilkins received a bottle of shampoo/body wash instead of the bar soap he had ordered from the commissary. (ECF No. 15 at 8.) After a few uses, he developed a skin irritation. A nurse told him to drink more water and to try some antifungal cream or hydrocortisone cream. (ECF No. 15 at 8.) Mr. Wilkins received little relief from following those directions.

Dkt. 18 at 2-4.

### 3. Defendants' Version

#### a. Plaintiff's Medical Care and Treatment at Santa Rita from November 2013 Through October 2015

Shortly after Plaintiff's arrival at Santa Rita on November 23, 2013, a healthcare provider completed an intake screening, noting Plaintiff was reporting arthritis and that his skin appeared unremarkable. Magat Decl., Ex. A at 1-6.[8] Plaintiff's only reported allergies were to peanuts, penicillin, and Keflex (an antibiotic). *Id.* at 2. No signs of significant medical issues or need for any referrals were evident. *Id.* at 1.

---

[7] In his second amended complaint, Plaintiff incorrectly referred to Defendant Tha as "Dr. Tha Kin." Dkt. 15 at 3.

[8] The Court will use the page numbers at the bottom right of Exhibit A, which is attached to Defendant Magat's declaration. *See* Magat Decl., Ex. A.

On November 26, 2013, Plaintiff was unavailable for a follow-up examination. *Id.* at 7. The examination was rescheduled. *Id.*

On December 2, 2013, Registered Nurse ("RN") Rachel Rojas assessed Plaintiff, who reported that he was taking Tylenol and Motrin for "chronic arthritis." *Id.* Though Plaintiff reported joint pain, he was in no apparent distress and ambulated with a steady gait. *Id.* He voiced no other complaints. *Id.* RN Rojas consulted with a physician, Dr. Achla Raina, who prescribed Tylenol. *Id.*

On December 3, 2013, another nurse, RN M. Inocencio, examined Plaintiff and found no signs of significant medical issues or need for referral. *Id.* at 8-14. Plaintiff's "old dislocation of the shoulder" resulting in a "protrusion" of his right clavicle dislocation was referenced in the nurse's notes. *Id.* at 13. RN Inocencio noted that no referral was needed and nothing in her notes showed that Plaintiff was in any acute distress. *Id.* at 8-14.

On December 20, 2013, Plaintiff was assessed by RN Zanaida Gutman. *Id.* at 16. Plaintiff requested cream for a rash on his back. *Id.* He also requested to be examined by a physical therapist because he was unable to bend his left finger. *Id.* Plaintiff also requested a renewal of his pain medication prescription. *Id.* at 15.

On January 7, 2014, Plaintiff refused to meet with Physical Therapist ("PT") Rodney Silveira.[9] *Id.* at 18.

On January 23, 2014, RN Gutman assessed Plaintiff, who complained of jock itch and athlete's foot. *Id.* at 15. Dr. Raina ordered antifungal cream. *Id.* at 15, 17.

On February 6, 2014, Dr. Raina examined Plaintiff, noting that he was requesting Tylenol for his arthritis in his back and hands. *Id.* at 18. Dr. Raina noted that Plaintiff "denie[d] any other symptoms." *Id.* She prescribed Tylenol. *Id.*

---

[9] Plaintiff claims that on January 6, 2014, he submitted a request to see a physical therapist for "an x-ray of [his] collar-bone clavicle area." Dkt. 140-1 at 6. Plaintiff claims that he told the nurse about the "volume of pain [he] was experiencing, and requested for treatment for [his] right shoulder and also [for] pain medication." *Id.* The Court assumes that Plaintiff was then referred to meet with PT Silveira on June 7, 2014. Magat Decl., Ex. A at 18.

On March 12, 2014, Dr. Raina examined Plaintiff for his complaints that he had been suffering from a headache for the past ten days. *Id.* at 19. Dr. Raina noted that Plaintiff stated that he had a history of a gunshot wound to the head in 2009 and being hit with a baseball bat two years ago. *Id.* Dr. Raina further noted that Plaintiff was alert, oriented, displayed no distress, and ambulated with a steady gait. *Id.* She ordered a "[t]rial of [Nonsteroidal Anti-Inflammatory Drug ("NSAIDs")]." *Id.* at 19.

On March 20, 2014, Dr. Raina again examined Plaintiff, who requested deck[10] shoes to facilitate exercise. *Id.* at 20. Plaintiff also complained of jock itch and an allergy to the shower gel. *Id.* According to Dr. Raina, Plaintiff told her that "using a mosturiser [sic] helps," but that it was "giving him stress and [a] headache." *Id.* Dr. Raina noted that Plaintiff was "alert, oriented, [and exhibited] no distress, [and a] steady gait." *Id.* She gave Plaintiff a chrono for deck shoes and prescribed "Miconazole[11] for tinea cruris.[12]" *Id.* at 20-21. Plaintiff informed Dr. Raina that he would "put in a sick call for [the Criminal Justice Mental Health (CJMH)] for ongoing stress." *Id.*

On March 26, 2014, Dr. Raina examined Plaintiff in response to his complaint that he was experiencing "numbness in his hands in [the] morning," but "when he move[d] his hands it disappear[ed]." *Id.* at 22. Plaintiff claims that "it started after he was tightl[y] handcuffed for 6 [hours] in November [of] last year." *Id.* Plaintiff requested physical therapy. *Id.* Dr. Raina noted that he "denie[d] any numbness in arms or weakness in hands or arms . . . [or] any neck pain." *Id.* Dr. Raina examined him and noted as follows: "Normal sensation to light touch and pinprick [to] both hands, no atrophy of hand muscles, good capillary refill, [and] [g]ood [range of motion] of hand joints." *Id.* Dr. Raina pointed out that this was the first time Plaintiff had complained about hand numbness, and she also noted that carpal tunnel syndrome was "unlikely." *Id.* She

---

[10] Deck shoes are closed-toe shoes. Magat Decl. ¶ 4(h).

[11] Miconazole (also known as Micatin) is used to treat skin infections such as athlete's foot, jock itch, ringworm, and other fungal skin infections (candidiasis). *See* https://www.webmd.com/drugs/2/drug-151533/antifungal-miconazole-topical/details (last visited August 30, 2018).

[12] Tinea cruris, which is another name for "jock itch," is a common skin infection that is caused by a type of fungus called tinea. *See* https://www.webmd.com/skin-problems-and-treatments/qa/what-is-jock-itch (last visited August 30, 2018).

1  prescribed more pain medication for his arthritis and referred him to physical therapy. *Id.*

2      On April 18, 2014, Defendant Magat examined Plaintiff, who complained of a "rash and

3  itching." *Id.* at 23. Plaintiff told Defendant Magat that "his skin looked relatively better but he

4  continue[d] to itch an[d] as a result [he] ke[pt] scratching his legs." *Id.* Defendant Magat

5  determined Plaintiff had dermatitis.[13] *Id.* Defendant Magat prescribed Benadryl 25 mg. capsules

6  for Plaintiff's itching, directed him to continue with his hydrocortisone and Micatin creams, and

7  recommended a follow-up examination in two weeks. *Id.* at 23-24.

8      On May 1, 2014, Dr. Raina examined Plaintiff, who stated a rash on his leg was improving

9  but continued to itch. *Id.* at 24. Dr. Raina prescribed more Benadryl 25 mg. capsules for

10  Plaintiff's itching. *Id.*

11      On May 6, 2014, Nurse Practitioner ("NP") Lisa Iijima ordered Extra Strength Tylenol for

12  pain relief, and Micatin as well as hydrocortisone cream for his rash. *Id.* at 25.

13      On May 8, 2014, PT Silveira examined Plaintiff, who was complaining of hand numbness

14  that "occurred after he was in handcuffs for '10 hours' 11/23/2013." *Id.* at 86. PT Silveira's

15  assessment was as follows: "Postural dysfunction, i.e., [morning] numbness post sleeping posture.

16  Patient symptoms go[] away upon movement. Possible nerve injury post cuffs but since

17  symptoms occur with posture and prolonged posture it is likely postural dysfunction [versus]

18  ischemic nerve injury." *Id.* PT Silveira instructed Plaintiff on "postural correction and mobility

19  hand exercise[s]." *Id.*

20      On May 15, 2014, NP Iijima prescribed Micatin and Vistaril.[14] *Id.* at 25-28.

21      On May 21, 2014, Dr. M. Graves-Matthews, who was the psychiatrist assigned to evaluate

---

[13] Symptoms for atopic dermatitis (also known as eczema) include itchy, red, and dry skin caused by inflammation, and it is treated with oral medications, steroid creams and light therapy. *See* https://www.webmd.com/skin-problems-and-treatments/eczema/default.htm (last visited August 30, 2018).

[14] Vistaril is an antihistamine that is used to treat itching caused by allergies. *See* https://www.webmd.com/drugs/2/drug-6144/vistaril-oral/details (last visited August 30, 2018).

Plaintiff's metal health, ordered diphenhydramine[15] for his allergies and Paxil.[16]  *Id.* at 29-30.

On June 2, 2014, NP Iijima examined Plaintiff for "scalp wounds and tenderness when lying down," continued itching, and pain.  *Id.* at 31.  Plaintiff requested the renewal of his prescriptions for Vistaril and Tylenol.  *Id.*  NP Iijima noted that she examined his occipital area[17] and noticed "scattered lesions and erythema[18]. . . [n]o fluctuance or purulent discharge noted."  *Id.*  NP Iijima noted that Plaintiff had pruritis[19] and a minor flare-up of folliculitis,[20] and she ordered clindamycin[21] and renewed his Vistaril and Tylenol prescriptions.  *Id.* at 31-34.

On June 16, 2014, Licensed Vocational Nurse ("LVN") Dory Bothwell assessed Plaintiff, who complained of "itchy skin due to harsh soap" and jock itch.  *Id.* at 35.  LVN Bothwell noted Plaintiff "d[id] not appear to be in acute distress."  *Id.*  LVN Bothwell obtained an order for calamine lotion and renewal of Miconazole and hydrocortisone.  *Id.*

On June 18, 2014, Dr. Graves-Matthews again prescribed Paxil and Vistaril.  *Id.* at 36-37.

On July 3, 2014, LVN Bothwell met with Plaintiff who was "requesting all chronos be

---

[15] Diphenhydramine is an antihistamine used to relieve symptoms of allergy, hay fever, and the common cold.  *See* https://www.webmd.com/drugs/2/drug-1428/diphenhydramine-oral/details (last visited August 30, 2018).

[16] Paxil (also known as paroxetine) is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder.  *See* https://www.webmd.com/drugs/2/drug-6968-9095/paxil-oral/paroxetine-oral/details (last visited August 30, 2018).

[17] The occipital area is the back of the head, the portion of the skull made of the occipital bone, and the part of the cerebrum below the occipital bone.  *See* Online Medical Dictionary, retrieved August 30, 2018, from https://medical-dictionary.thefreedictionary.com/occipital+area.

[18] Erythema means abnormal redness of the skin or mucous membranes due to capillary congestion (as in inflammation).  *See* Merriam-Webster Online Dictionary, retrieved August 30, 2018, from https://www.merriam-webster.com/dictionary/erythema.

[19] Pruritus means itching.  *See* https://www.webmd.com/skin-problems-and-treatments/guide/skin-conditions-pruritus (last visited August 30, 2018).

[20] Folliculitis is a common skin problem of having sore red bumps that resemble pimples, especially after shaving.  *See* https://www.webmd.com/skin-problems-and-treatments/what-is-folliculitis#1 (last visited August 31, 2018).

[21] Clindamycin is an antibiotic used to treat a wide variety of bacterial infections.  *See* https://www.webmd.com/drugs/2/drug-12235/clindamycin-hcl-oral/details (last visited August 31, 2018).

extended [by] 1 more year," including his chronos for "2 pillows, 2 mattresses, blanket, lower bunk/tier, [and] deck shoes." *Id.* LVN Bothwell noted that Plaintiff had an "agitated demeanor," and explained to him that his "[primary care] provider will assess" whether the chronos can be renewed. *Id.*

On July 10, 2014, NP Iijima ordered Tylenol. *Id.* at 38.

On July 15, 2014, PT Silveira noted that Plaintiff requested "an update of his chronos." *Id.* at 39. PT Silveira stated that Plaintiff was given two pillows and an extra mattress. *Id.* PT Silveira added that Plaintiff's "previous injuries [were] improving slowly but steadily." *Id.*

On July 22, 2014, PT Silveira discontinued further physical therapy visits because Plaintiff was "doing well with no new complaints." *Id.* at 39.

On July 25, 2014, Defendant Magat ordered Micatin cream. *Id.* at 40.

On August 13, 2014, Defendant Chen examined Plaintiff in connection with his reported arthritis and skin issues due to "soap and water in [the] jail makes him itch." *Id.* at 41. According to Defendant Chen, Plaintiff requested Tylenol for arthritis, and hydrocortisone and calamine lotion for his skin. Chen Decl. ¶ 3. Defendant Chen noted that Plaintiff "appeared very comfortable, walked well, and his movements were fluid." *Id.* Upon examination, Defendant Chen found that, "other than a small, superficial excoriation[22] on his back and a small facial pimple, [Plaintiff's] skin was clear." *Id.* (footnote added). Defendant Chen added that "[n]o signs of significant skin irritation were evident. *Id.* Defendant Chen wrote in the notes: "The rest of the body including genitals is clear of lesions." Magat Decl., Ex. A at 41. Defendant Chen further elaborates on his treatment plan as follows:

> Calamine lotion is an over-the-counter topical lotion used to treat itchiness and discomfort from minor skin irritations. I learned that [Plaintiff] had been receiving Benadryl and Vistaril, which are antihistamines that can treat itchiness. I ordered hydrocortisone cream for additional itch relief. In my view, these three medications would sufficiently address [Plaintiff's] reported itchiness, so calamine lotion was not medically indicated. For [Plaintiff's] reported arthritis-related pain, I prescribed Tylenol after discussing

_____

[22] Excoriation, also known as "skin picking disorder," happens when picking a scab or the skin around the nails becomes so frequent and intense that it causes bleeding, sores, and scars. *See* https://www.webmd.com/mental-health/skin-picking-disorder#1 (last visited August 30, 2018).

with him the potential serious problems associated with its long-term use (e.g. liver problems).

Chen Decl. ¶ 3.

On August 27, 2014, Defendant Chen again examined Plaintiff, who he requested calamine lotion for his reportedly itchy skin and a jacket for his arthritis. *Id.* ¶ 4. Defendant Chen noted that Plaintiff "walked well [and] look[ed] comfortable," and was able to "mov[e] all [his] extremities equally and without difficulty." Magat Decl., Ex. A at 42. Defendant Chen then made the following assessment:

> Given [Plaintiff's] presentation and the Benadryl, Vistaril and hydrocortisone that already had been provided to him, I determined that he was receiving adequate medication for his professed skin-related discomfort. Calamine lotion was not medically indicated. With regards to the jacket, it is not a physicians' obligation to provide one (or other clothing or accessories for extra warmth) when such an accommodation is not medically indicated. Arthritis alone is medically insufficient to warrant a jacket. In the absence of an apparent medical need, standard practice is to obtain a recent blood test to determine if a patient has a condition causing cold sensitivity. Since [Plaintiff] was not exhibiting any medical need for a jacket, I recommended a blood test. He appeared agitated that I did not give him what he desired. He declined the testing.

Chen Decl. ¶ 4.

On September 12, 2014, Defendant Magat ordered Tylenol and calamine lotion. Magat Decl., Ex. A at 43-44.

On September 24, 2014, Defendant Chen again examined Plaintiff, who was seeking a jacket. *Id.* at 45. Defendant Chen noted that he "look[ed] comfortable . . . [and] mov[ed] all extremities equally." *Id.* Defendant Chen explained that "[a]the time [Plaintiff] had not taken a recent blood test to determine if he had an underlying condition associated with cold sensitivity." Chen Decl. ¶ 5. Defendant Chen denied Plaintiff's request and stated that "[a]s no medical indication for a jacket was evident, providing a jacket was not medically warranted." *Id.*

On September 29, 2014, Defendant Newell examined Plaintiff who complained that "he ha[d] arthritis in all of his joint[s]" and that he "is cold and he feels the cold weather and the coldness in the jail is uncomfortable for his joints." Magat Decl., Ex. A at 46. Defendant Newell added that Plaintiff was "bothered most by arthritis in his elbow and shoulders" and that it resulted in pain. *Id.* Defendant Newell stated that Plaintiff "also reported taking Norco (an opioid

medication that also contains acetaminophen) when not incarcerated." Newell Decl. ¶ 3.

Defendant Newell discussed with Plaintiff "the side effects of long term treatment with [nonsteroidal anti-inflammatory or "NAIA"] and Tylenol medications," and explained the reason as follows:

> Objectively, I noted that [Plaintiff] ambulated without difficulty. Based on the absence of any indication in my progress note to the contrary, I also know that he exhibited full range of motion, displayed no difficulty raising his limbs or sitting or rising from a seated position, and otherwise exhibited no signs of significant pain—e.g., sweating, grimacing, or moaning. I was concerned about the risks of [Plaintiff's] long-term use of the medications he referenced because they can cause serious problems like kidney damage and gastrointestinal bleeding. Norco also generally is not recommended for long-term pain treatment, including for patients like [Plaintiff]. It also can be habit-forming.

*Id.* Because Plaintiff was "not exhibiting objective signs of significant pain" and he had "a recent history of long-term use of nonsteroidal anti-inflammatory agents," Defendant Newell "decided to give him a "drug holiday" from the pain medications referenced, and to instead provide analgesic balm, which in [her] view was sufficient to adequately address his reported symptoms." *Id.* Defendant Newell also noted that she recommended a "complete blood count and thyroid-stimulating hormone testing" in order "to evaluate for symptoms of cold intolerance," but Plaintiff declined it. *Id.*; Magat Decl., Ex. A at 46.

On October 1, 2014, Mr. Wilkins refused a medical interview and exam with Defendant Chen. Chen Decl. ¶ 6.

Instead on that date, Plaintiff was assessed by LVN Mand Rajbinder. Magat Decl., Ex. A at 51. Plaintiff requested antifungal cream, hydrocortisone, and clotrimazole cream. *Id.* Defendant Magat was notified. *Id.* According to Defendant Magat, Plaintiff "had no complaints of pain and his skin was warm, dry, and intact. Magat Decl. ¶ 4(p). Defendant Magat ordered hydrocortisone and Micatin cream. *Id.*

The record shows that on October 15, 2014, Plaintiff agreed to a blood test. Magat Decl. ¶ 4(q).

On October 27, 2014, Defendant Newell examined Plaintiff, who reported some hernia discomfort and a headache. Magat Decl., Ex. A at 52. Defendant Newell recommended a hernia

belt to help alleviate any discomfort upon making the following findings:

> Upon examination I found a small protrusion in his left inguinal[23] area. No signs of strangulation, irreducibility, or infection were evident. I ordered a hernia belt for discomfort relief and recommended that he consider further follow-up to explore the possibility of surgery if post-release the minor hernia still continued to bother him.

Newell Decl. ¶ 6; Magat Decl., Ex. A at 52-53 (footnote added).

On November 3, 2014, Defendant Magat reviewed Plaintiff's October 15, 2014 blood test, and she determined it showed only a mild cholesterol-related concern, which is not associated with cold sensitivity. Magat Decl. ¶9. Specifically, Defendant Magat stated as follows: "[the blood test result] showed that [Plaintiff's] complete blood count and hematocrit levels were within normal limits, indicating he was not anemic. Thyroid function and metabolic panel results also were within normal limits. No medical indication for a jacket was evident." Magat Decl. ¶ 4(q), Ex. A at 54-56. Therefore, Defendant Magat denied Plaintiff's request for a jacket. *Id.*

On November 24, 2014, LVN Rajbinder assessed Plaintiff, who sought a renewal of his calamine lotion and skin creams. Magat Decl., Ex. A at 57. Plaintiff's skin was "warm and dry to touch," and "skin [was] intact." *Id.* Plaintiff had no complaints of pain and was calm. *Id.* He was provided another prescription for hydrocortisone, Micatin, and calamine lotion. *Id.*

On December 11, 2014, Defendant Magat authorized a jacket for Plaintiff despite the absence of a medical need for one. Magat Decl. ¶ 4(s), Ex. A at 58. Defendant Magat added that it was "[her] recollection is that [she] did so because a sergeant asked [her] to do so because Plaintiff somehow had obtained a court order[24] for one." *Id.* (footnote added).

---

[23] An inguinal hernia happens when a part of the small intestine or fat pushes through a weak area of your lower abdominal wall. *See* https://www.webmd.com/digestive-disorders/inguinal-hernia#1 (last visited August 31, 2018).

[24] In his opposition, Plaintiff states that he obtained four state court orders from Alameda County Superior Court Judge Paul Delucci (dated July 8, 2014, August 13, 2014, August 26, 2014 and September 26, 2014) directing Santa Rita medical staff to address certain requests for treatment for his various conditions. *See* Dkt. 140-1 at 5; Dkt. 140, Ex. A at A51-A54. As mentioned, Defendants have filed objections to such evidence and a motion to strike, but the Court earlier denied his request as moot. Moreover, even if the Court considered this evidence, it is not sufficient to defeat summary judgment.

On December 23, 2014, Dr. Tha examined Plaintiff regarding his hernia.  Magat Decl., Ex. A at 59.  Defendant Tha noted that Plaintiff reported "left hip pain, numbness from his left groin to left leg, an inguinal hernia, and a rash near his hairline."  *Id.*; Tha Decl. ¶ 4.  Defendant Tha stated that Plaintiff exhibited no signs of any significant distress—e.g. moaning or grimacing.  Tha Decl. ¶ 4.  Defendant Tha also noted that Plaintiff's "blood pressure was 132/87 and his pulse was 68," and that "both these vital signs were within normal limits [which] corroborates the absence of significant pain."  *Id.*  Defendant Tha added that "[u]pon examination of [Plaintiff's] left groin and hip, [Defendant Tha's] assessment was likely mild inflammation of his bursa,[25] likely due to arthritis.  *Id.* (footnote added).  Defendant Tha ordered 600 mg of ibuprofen twice a day for fourteen days.  *Id.*  Defendant Tha found no cause for deviating from conservative treatment entailing clinical monitoring, stating as follows:

> With respect to his hernia, he reported no constipation or abdominal pain and was able to pass gas.  He denied nausea or fever.  His abdomen was soft with normal bowel sounds present.  No rebound tenderness was evident.  The hernia was not red or warm.  No signs of strangulation, infection, or irreducibility were evident.  He reported already having a hernia belt to alleviate discomfort, though I do not recall him wearing it during the examination.  Given the comparatively minor nature of the hernia, the standard of care did not require surgical referral.

*Id.*

On January 12, 2015, Defendant Tha noted results from an October 15, 2014 lab test showed a normal blood count and normal thyroid hormones, signaling the absence of an underlying condition associated with cold sensitivity.  Magat Decl., Ex. A at 60, Tha Decl. ¶ 6.  Defendant Tha noticed that Plaintiff's "cholesterol was high."  Tha Decl. ¶ 6.  Defendant Tha ordered thyroid and blood tests.  *Id.*  Defendant Tha noted that X-rays revealed that Plaintiff's L-S spine (lower back) had no acute fracture, and his left hip looked "normal."  Magat Decl., Ex. A at 60.

---

[25] The bursa is a sac filled with lubricating fluid, located between tissues such as bone, muscle, tendons, and skin, that decreases rubbing, friction, and irritation.  *See* https://www.webmd.com/pain-management/arthritis-bursitis#1 (last visited August 31, 2018).

On January 15, 2015, Defendant Tha noted that Plaintiff's recent blood test showed a normal blood count and thyroid hormones. *Id.*

On April 15, 2015, Defendant Chen examined Plaintiff, who was requesting fungal cream for his groin and buttocks. Chen Decl. ¶ 7. Defendant Chen noted that Plaintiff looked comfortable and was walking well. *Id.* Upon examination of Plaintiff's groin, scrotum, and perineal areas, Defendant Chen found that Plaintiff's skin was clear except for a small epidermal cyst on his mons pubis.[26] *Id.* (footnote added). Defendant Chen noted that because evidence of a fungal infection in his groin was absent, no medical indication for fungal cream existed. *Id.* Instead, Defendant Chen made the following recommendation, stating: "I recommended that he apply warm compresses to his skin on an as-needed basis for his epidermal cyst. Warm compresses are a medically appropriate treatment for minor cysts like Mr. Wilkins's because they open up pores so oil glands can release." *Id.*

On April 22, 2015, Defendant Chen examined Plaintiff, who requested fungal cream for a reported burning sensation. Chen Decl. ¶ 8. Defendant Chen noted that Plaintiff appeared in no acute distress and ambulated well. *Id.* Defendant Chen stated that Plaintiff refused to undress and reported that his symptoms remained the same as they had been during my examination the week before. *Id.* Defendant Chen explained why he found that fungal cream was not medically appropriate, stating ad follows:

> When a patient is non-cooperative and withholds consent to further examination, a physician's medical care choices are limited by the patient's subjective reports and objective presentation. Given the lack of objective signs of fungal infection at that time and during the April 15 exam, I determined fungal cream was not medically appropriate and arranged for a follow-up visit with another provider.

*Id.*

On June 11, 2015, Defendant Magat prescribed Tylenol. Magat Decl., Ex. A at 61-62.

On June 19, 2015, Dr. Robert Anderson examined Plaintiff, who complained of knee and

---

[26] The mons pubis is the rounded eminence of fatty tissue on the pubic symphysis. *See* Merriam-Webster Online Dictionary, retrieved September 1, 2018, https://www.merriam-webster.com/dictionary/mons%20pubis.

wrist pain and sought Motrin. *Id.* at 62. Dr. Anderson and Defendant Magat discussed Plaintiff's long-term use of ibuprofen and the associated risk of gastrointestinal hemorrhage and renal problems. *Id.* They agreed that a break from Motrin would be in Plaintiff's best interests and continued with Tylenol instead. *Id.*

On June 27, 2015, Dr. Uchenna Okoronkwa prescribed Tylenol for Plaintiff. *Id.* at 63.

On July 10, 2015, Defendant Magat prescribed analgesic balm. *Id.* at 64.

From June 27, 2015 to August 28, 2015, Plaintiff received prescriptions: selenium sulfide topical suspension, hydrocortisone cream, calamine lotion, analgesic balm, and Micatin (for his skin issues); simvastatin (for his cardiovascular disease); ibuprofen and Tylenol (for pain); vitamin B (for neuropathy); and diphenhydramine and Paxil (for his mental health). *Id.* at 65-84.

On October 12, 2015, Dr. Jeffrey Cooper extended Plaintiff's jacket authorization for the remainder of his stay at the jail. *Id.* at 85. Dr. Cooper also renewed Plaintiff's prescriptions for Miconazole cream, selenium sulfide topical suspension, ibuprofen, and a knee brace. *Id.* Finally, Plaintiff requested to start treatment for tuberculosis infections, but Dr. Cooper stated that he would first check with the tuberculosis coordinator. *Id.*

As mentioned above, on October 29, 2015, Plaintiff transferred from Santa Rita Jail to SQSP.

### b. Plaintiff's Medical Care and Treatment in SQSP From November 2015 through 2016

On November 12, 2015, SQSP physician (Dr. E. Tootell) noted Plaintiff's x-rays reflected only "mild" arthritis in his left shoulder and "normal" results in his right and left knees. Chung Decl., Ex. 1 at 1-3.

On December 1, 2015, Dr. Tootell ordered x-rays of Plaintiff's hands and wrists, and the results were "normal" and there was "no evidence of fracture" in any of the x-rays. *Id.* at 6-9.

On February 24, 2016, Plaintiff was examined by an "off-site surgery" department, which recommended inguinal hernia repair. *Id.* at 4.

On March 2, 2016, SQSP Physician Dr. Clarene David examined Plaintiff, who complained of skin issues affecting his mons pubis. *Id.* at 4. She noted that Plaintiff was

demanding antibiotics for his skin condition and a dermatology consultation, which she concluded were "not clinically indicated at this time." *Id.* Dr. David recommended the use of warm compress and benzoyl peroxide gel, but Plaintiff disagreed with these recommendations and became hostile. *Id.* Plaintiff left but demanded to be sent to the Triage and Treatment Area. *Id.*

On March 16, 2016, Plaintiff complained that Dr. David "denied [him] adequate primary health care" for his "chronic conditions with [his] skin rashes that [were] burning/pussing and bleeding between [his] legs/private areas." *Id.* at 10. Plaintiff also complained that his "feet hurt[]" and requested treatment for plantar fasciitis.[27] *Id.*

On March 23, 2016, RN K. Neal examined Plaintiff and noted that his rash was "getting better" and being treated with "shampoo." *Id.* RN Neal also noted that Plaintiff would rather complain about doctor that "provide subjective information about rash and feet pain." *Id.* RN Neal encouraged Plaintiff to use the grievance process for any complaints against his doctor and to submit a health care services request form for any medical complaints. *Id.*

On November 25, 2015, Dr. Tootell examined Plaintiff and discussed his hernia, pain in his wrist/hands, and request for "warm clothes." *Id.* at 11. Dr. Tootell noted that Plaintiff would like to undergo surgery to repair his hernia, but he requested to have the surgery "when he is at an endorsed facility." *Id.* Dr. Tootell continued "over-the-counter NSAIDs" to treat his hernia. *Id.* Dr. Tootell ordered x-rays for his wrists. *Id.* Plaintiff also complained about his right shoulder, specifically "acromioclavicular[28] joint separation on his right side," and he indicated that he wanted to discuss possible surgery. *Id.* at 11-12 (footnote added). Dr. Tootell noted that she told him "it does not appear that he has very much pain and surgery may cause some pain and long-acting pain." *Id.* at 12. Finally, Dr. Tootell indicated that she prescribed selenium shampoo for Plaintiff's flaky scalp and benzoyl peroxide for the "mild acne" on his back. *Id.* at 11-12.

---

[27] Plantar fasciitis is a painful condition caused by inflammation of the bands of tissue that connect the heel to the toes. *See* https://www.webmd.com/fitness-exercise/understanding-plantar-fasciitis-symptoms (last visited September 4, 2018).

[28] The acromioclavicular joint is where the uppermost part of the shoulder blade—a structure called the acromion—meets the collarbone. *See* https://www.webmd.com/pain-management/qa/what-is-an-acromioclavicular-ac-joint-injury (last visited September 4, 2018).

On March 28, 2016, Plaintiff had his hernia surgery.  Pl.'s Depo., 80:10-18.

On June 29, 2016, RN G. Han assessed Plaintiff, who complained about his right shoulder. *Id.* at 5.  RN Han noted that Plaintiff said his pain was a 1 out of 10.  *Id.*  RN Han also noted that Plaintiff refused to see Dr. David on June 21, 2016 due to his grievance filed against her, but he wanted to see another doctor.  *Id.*  RN Han explained to Plaintiff that he had "no right to choose which provider to see but due to his request . . . [RN Han] might try to schedule other Dr. to [follow-up] on him but no guarantee."  *Id.*

At his September 14, 2016 deposition, Plaintiff indicated that he was being "prepp[ed] for the shoulder surgery" on that day.  Pl.'s Depo., 81:4-6; 99:13-14.  Nothing in the record indicates whether Plaintiff has had the aforementioned shoulder surgery.[29]

## III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

---

[29] In his opposition, Plaintiff has provided medical records showing that after he was transferred to SQSP, he had x-rays of his "right shoulder injuri[es]" taken in 2015 and a magnetic resonance imaging or MRI done at an unknown date.  Dkt. 140-1 at 7.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In support of the motion for summary judgment, each Defendant (all female physicians) has presented her own declaration/supporting exhibits. Dkts. 126-129. Defendants have also attached declarations/supporting exhibits by Sergeant Rick Macintire (from Santa Rita grievance unit) and their attorney, Pamela Chung, Esq. (dkts. 130-131). Defendants have provided certified copies of Plaintiff's medical records from Santa Rita and SQSP, as well as the transcript of Plaintiff's September 14, 2016 deposition. Chung Decl., Exs. 1-3. Meanwhile, Plaintiff has filed his verified second amended complaint, opposition, and declaration. Dkts. 15, 15-1, 15-2, 140, 140-1, 140-6. Plaintiff has also submitted declarations made under penalty of perjury from three inmates who also allege denial of adequate care at Santa Rita: Thomas Banks; William Turner; and Tijue A. Mcghee. Dkts. 15-7, 15-8, 15-9. The Court construes Plaintiff's second amended complaint as an affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

## IV.    DELIBERATE INDIFFERENCE TO MEDICAL NEEDS CLAIM

The Eighth Amendment protects prisoners from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under section 1983.  *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs."  *Estelle*, 429 U.S. at 104. "This includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need.  *Estelle*, 429 U.S. at 104.  A "serious medical need[]" exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain."  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle*, 429 U.S. at 104), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.  *McGuckin*, 974 F.2d at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

To satisfy the subjective element, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  A plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk to [the plaintiff's] health."

United States District Court
Northern District of California

*See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*

Here, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they denied him adequate treatment for his various ailments from November 2013 through October 2015. Dkt. 15 at 7-11; Dkt. 15-1 at 1-11; Dkt. 15-2 at 1-5.

While Defendants seem to concede that, as alleged, Plaintiff's health conditions may rise to the level of a serious medical need, they argue that no evidence exists to show that Defendants acted with "deliberate indifference" to that need. Dkt. 124 at 12-22. Defendants also argue that their treatment of Plaintiff's various ailments was within the standard of medical care, and thus they did not make "any 'medically unacceptable' care decision[s]." *Id.* at 13. Specifically, Defendants argue that the undisputed evidence confirms that no Defendant "left Plaintiff exposed to any 'excessive health risk,'" "consciously disregarded any such purported risk," and/or "caused harm." *Id.* Following a review of Plaintiff's medical records, Defendants summarize the treatment provided to Plaintiff as follows:

A. <u>Skin Issues</u>

During various portions of his pertinent incarceration, he experienced jock itch, dermatitis, pruritus, athlete's feet, and dandruff. Magat Decl., ¶5. These problems are comparatively minor and often resolve on their own. *Id.*, ¶6. Numerous healthcare providers examined and treated him for these issues, including with antihistamines, antifungal meds, hydrocortisone, calamine lotion, miconazole nitrate, and selenium sulfide. Magat Decl., ¶¶4-6.

After Plaintiff transferred to San Quentin during October 2015, he experienced similar skin issues and received essentially the same treatment. San Quentin Med. Recs. (Exh. 1 to the Chung Decl.). He also continued to clash with his female care providers about appropriate treatment choices. For example, when Clarene David, M.D., at San Quentin declined to provide antibiotics for Plaintiff's "very mild furnuculosis [sic][30]," Plaintiff became "very hostile" and

---

[30] Furunculosis (also known as a boil) is a localized swelling and inflammation of the skin resulting from infection of a hair follicle and adjacent tissue, having a hard central core, and forming pus. *See* Merriam-Webster Online Dictionary, retrieved September 6, 2018, from https://www.merriam-webster.com/dictionary/boil#h2.

21

demanded antibiotics and a referral to a dermatologist—even though neither antibiotics nor the referral were medically warranted. Exh. 1, p. 4.

### B.  Arthritis-Related Issues

Plaintiff claims to have arthritis. Second Amended Complaint (SAC), ¶¶45, 90. Diagnostic testing has confirmed mild arthritis in his shoulder. *See* Exh. 1 [to the Chung Decl.], p. 1. However, no arthritic changes were noted following diagnostic testing of his hands, wrists, left hip, or knees. *See* Exh. 1, pp. 2-3, 6-9.

Numerous Santa Rita healthcare providers assessed and treated him throughout his pertinent incarceration for his arthritis complaints. They provided on various occasions ibuprofen, acetaminophen (i.e., Tylenol), and analgesic balm. *See, e.g.*, Magat Decl., ¶¶ 4, 7.

Plaintiff claimed during his pertinent incarceration that, even during the summer, arthritis entitled him to cold weather clothing, most notably a jacket. However, arthritis in itself does not make cold weather clothing medically indicated. Newell Decl., ¶10; Chen Decl., ¶4. Physicians are not obligated to authorize such accommodations in the absence of a medical need for them. Unless a medical need dictates otherwise, it is custody staff's responsibility to provide appropriate apparel. Though Plaintiff eventually managed to obtain a jacket, he had no medical need for one. Magat Decl., ¶9; Newell Decl., ¶10.

In the absence of a medical need for cold weather clothing, when Plaintiff arrived at San Quentin and sought it, Chief Medical Officer Elena Tootell, M.D., explained that medical staff would not be involved in the provision of such apparel, "so he can ask his Custody officer if that is something he would like." Exh. 1, p. 11.

Plaintiff also contends that, during his Santa Rita pertinent incarceration, arthritis entitled him to closed-toe shoes. Though he eventually persuaded a care provider to authorize them simply by complaining his feet hurt (Pl.'s Depo., 96:13-14), the standard of care did not require such authorization. Magat Decl., ¶10; Chen Decl., ¶4; Tha Decl., ¶13; Exh. A, pp. 20-21.

At San Quentin, Plaintiff claimed that, because he had worn shoes with inadequate support for four months, he had developed plantar fasciitis. Pl.'s Depo, 101:2-7. However, with respect to this lay self-diagnosis, a San Quentin provider wrote that, although Plaintiff "claims that he has plantar fasciitis [he is] not interested in triage of his [signs or symptoms and] would rather [complain about] doctor than provide subjective [insights]." Exh. 1, p. 10.

### C.  Hernia Treatment And Surgical Referral

Plaintiff had a small, inguinal hernia dating back to at least 2006. Magat Decl., Ex. A at. 87. He did not to have it surgically repaired in

the years prior to his pertinent Santa Rita incarceration. During various Santa Rita physician exams, the hernia was small, stable, reducible, and showed no signs of infection or strangulation. As a result, the hernia was appropriately treated with clinical monitoring rather than surgical referral. Magat Decl., ¶14; Tha Decl., ¶11. Dr. Newell also provided a hernia belt to alleviate any discomfort. Newell Decl., ¶6.

Though Plaintiff now claims he needed "emergency" hernia surgery during his Santa Rita incarceration, after his transfer to San Quentin, Plaintiff asked Dr. Tootell for surgery, but said "he does not want to do it while [in San Quentin]; he would like to have it followed up when he is at an endorsed facility." Exh. 1, pp. 11-12. Dr. Tootell noted Plaintiff's "very small" hernia "could be" repaired at the next facility to which Plaintiff was transferred, "if that is what the next facility wants to do for him." *Id.* She treated the hernia conservatively, just as it was treated at Santa Rita. *Id.* ("He will continue over-the-counter NSAIDs for that treatment and he has a truss.[31]").

D. <u>Shoulder And Clavicle Issues</u>

Plaintiff claims he fractured his clavicle and injured his shoulder prior to his pertinent Santa Rita incarceration. However, Physical Therapist Rodney Silveira's May 8, 2014 progress note reflects no subjective reports or objective signs of shoulder, clavicle, or shoulder joint separation. Exh. A, p. 86.

Plaintiff also did not mention any shoulder-related problems to any defendant, other than to claim his shoulder was among the parts of his body affected by arthritis. Newell Decl., ¶14; Magat Decl., ¶15; Chen Decl., ¶17; Tha Decl., ¶12.

After Plaintiff transferred to San Quentin, Plaintiff reported his shoulder pain was a 1 out of 10. Exh. 1, p. 5. Dr. Tootell examined Plaintiff's shoulder and expressed reservations about Plaintiff's apparent desire for shoulder surgery: "I did tell him it does not appear that he has very much pain and surgery may cause some pain and long-acting pain, and that this would be something he should talk about with a surgeon." Exh. 1, p. 12. Though Plaintiff claims he should have been referred for shoulder surgery during his incarceration at Santa Rita, Plaintiff admitted in September 2016 he had not had it despite being under the care of San Quentin physicians for over 14 months. Pl.'s Depo., 99:13-14.

Dkt. 124 at 8-11 (brackets and footnote added).

---

[31] A truss is a supportive undergarment that physicians recommend as non-surgical way to ease discomfort or pain from a hernia because it applies gentle pressure on the hernia and keeps it in place. *See* https://www.webmd.com/digestive-disorders/qa/what-are-nonsurgical-treatments-for-a-hernia (last visited September 4, 2018).

As mentioned above, a prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm. *McGuckin*, 974 F.2d at 1060. Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provided medical care. *See id.* at 1062.

To the extent that Plaintiff's claim amounts to medical malpractice or an allegation that Defendants were negligent in providing treatment, his allegations do not support an Eighth Amendment claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain).

Plaintiff's claims Defendants "did not provide [him] with the 'adequate' primary health care [he] needed and they did not provide [him] with the 'basic necessities' for everyday life (namely adequate shows and adequate cold weather clothing (a jacket/coat) . . . ." Dkt. 140-1 at 1. Despite this, Defendants have each submitted verified declarations indicating that Plaintiff's conditions and complaints were treated continuously based upon the medical evidence as well as the judgment of the medical providers. *See* Magat Decl. ¶¶ 4-16; Newell Decl. ¶ 3-16; Chen Decl. ¶¶ 3-17; Tha Decl. ¶¶ 4-15. As explained in detail above, the evidence shows that during the time period at issue, each time Plaintiff presented with complaints relating to his various ailments, he was evaluated, treated with medication, and given referrals when needed. The Court now conducts its analysis as to each of Plaintiff's various health conditions.

///

///

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A. Skin Issues

As to the alleged inadequate skin treatment for his variety of skin issues, including jock itch, dermatitis, pruritis, folliculitis, athlete's foot and dandruff, Plaintiff seems to take issue with the fact that he was denied adequate treatment for his skin issues, including being denied refills for Calamine lotion, which he claims was the only treatment that worked. Dkt. 140-1 at 4-5. However, Defendants have submitted evidence showing the refilled Plaintiff's prescription for Calamine lotion on multiple occasions, and when they did not refill it then they prescribed other treatments, including selenium sulfide and other antifungal medications, which they claim invariably met the standard of care. *See* Magat Decl. ¶¶ 5-6, 17-18; Newell Decl. ¶¶ 15, 17; Chen Decl. ¶¶ 10-11; Tha Decl. ¶¶ 10, 16; *cf. Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) ("A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim.") However, even if Plaintiff claims he should have received different treatment for his medical needs—i.e., a refill on Calamine lotion, prescription for antibiotics, and a referral to a dermatologist—a difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to the plaintiff's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837). The evidence here establishes that Defendants chose a course of treatments that was medically accepted. Although the medical treatment Plaintiff received may not have been what he considered proper treatment, he presents no evidence that these aforementioned Defendants were deliberately indifferent to his serious medical needs. Therefore, Plaintiff has failed to carry his burden of raising a genuine issue of fact to support his claim that Defendants' actions in response to his skin issues rose to the level of deliberate indifference to his serious medical needs.

**B.    Arthritis-Related Issues**

Plaintiff alleges that Defendants breached the standard of care by not providing cold weather clothing, an extra blanket, more pain medication, and/or closed-toe shoes in response to his arthritis. *See* Dkt. 15, 15-1. Specifically, Plaintiff claims that the denials of the needed closed-toe shoes and cold weather clothing occurred even though Plaintiff informed Defendants of his arthritis and the painful swelling in his joints and bones that resulted from the "cold, wet [and] rainy weather" he experienced when going to court during the time frame at issue. Dkt. 15-1 at 1-3. In the Order of Service, Magistrate Judge Beeler noted as follows:

> Although shoes and cold-weather clothes usually are not thought of as medical needs, the allegations of the second amended complaint indicate that a doctor or other health care provider had to write a chrono . . . authorizing the inmate to be provided with and/or possess these items. The Eighth Amendment's objective prong may be satisfied by jail officials' long-term denial of adequate clothing and shoes as well as denial of medical care. *See Farmer*, 511 U.S. at 832 (Eighth Amendment imposes duties on prison and jail officials to "provide humane conditions of confinement," including "adequate food, clothing, shelter, and medical care").

Dkt. 18 at 5, fn. 2.

As a preliminary matter, Defendants point out that Plaintiff's arthritis condition appears largely a function of self-diagnosis. Dkt. 124 at 16. At his deposition, Plaintiff testified he was "pretty sure" he had arthritis based on a doctor's diagnosis, but he was unable or unwilling to identify whatever doctor supposedly diagnosed it. *See* Pl.'s Depo., 65:6-67:2. Meanwhile, as explained above, throughout Plaintiff's incarceration at Santa Rita, Defendants denied Plaintiff his request for chronos for an extra blanket or extra cold weather clothing because such extra accommodations were not warranted, especially after Plaintiff's blood tests revealed only a "mild cholesterol-related concern, which is not associated with cold sensitivity." *See* Magat Decl. ¶ 9; *see, e.g.*, Magat Decl. ¶¶ 7-10; Chen Decl. ¶¶ 13, 15-16; Tha Decl. ¶ 13. Furthermore, the record reflects that Plaintiff was eventually granted chronos for closed-toe shoes and a jacket. *See* Magat Decl., Ex. A at 20-21 (closed-toe show chrono granted by Dr. Raina on March 20, 2014); Magat Decl. ¶ 4(s), Ex. A at 58 (jacket chrono granted by Defendant Magat on December 11, 2014). Though Plaintiff argues that the earlier provision of chronos for closed-toe shoes and a jacket were medically necessary to address a constitutionally excessive arthritis-related health risk, his medical

26

record confirms it was not. Magat Decl. ¶¶ 9, 11, Ex. A at 54-56; Newell Decl. ¶ 10; Tha Decl. ¶ 13; Chen Decl. ¶ 15. Plaintiff seems to argue alternatively that the earlier provision of the chrono closed-toe shoes was necessary to avert a substantial risk of serious harm in the form of potential plantar fasciitis, but nothing in the record shows that Plaintiff's lack of closed-toe shoes for a four-month time frame caused plantar fasciitis. *See* Magat Decl. ¶12. Meanwhile, as to Plaintiff's allegation that he was denied pain medication, Defendant Newell explained that she decided to "give him a 'drug holiday' from the pain medication . . . and to instead provide analgesic balm, which in [her] view was sufficient to adequately address his reported symptoms." Newell Decl. ¶¶ 5, 8-9. Moreover, even though Plaintiff argues the absence of more or different arthritis medications exposed him to an excessive risk, the evidence shows that Defendants treated his arthritis in accordance with the standard of care by giving him Tylenol, ibuprofen and analgesic balm. *See* Magat Decl. ¶¶ 7-8; Newell Decl. ¶¶ 8-10; Chen Decl. ¶ 16; Tha Decl. ¶¶ 8, 14.

Defendants attest that they never perceived any excessive health risk based on their decisions that the treatment and accommodations he was given were appropriate for his arthritis-related pain. Magat Decl. ¶¶ 7-8; Newell Decl. ¶¶ 4, 18; Chen Decl. ¶¶ 13-16, 19; Tha Decl. ¶¶ 13-14, 16. While such attestation is not surprising, no evidence is presented to the contrary. Defendants point out that Plaintiff admitted in his deposition that he can only *speculate* regarding whether any defendant believed the chosen treatment decisions entailed any excessive risk. *See* Dkt. 124 at 17 (citing Pl.'s Depo., 54:10-13 (revealing he can only speculate as to whether Dr. Magat knew he needed extra clothes); *id.*, 164:10-14 ("*What risks did [Dr. Chen] think that not giving you a jacket would expose you to? A: Well . . . I don't know what she was really thinking.*"); *id.*, 101:18-24 ("*Q: Did any of the doctors know that not giving you shower shoes sooner (sic) would cause you to develop plantar fasciitis? A: Well . . . you [are] asking me to speculate on what those doctors know and what they don't know as far as medical injuries and stuff, and I can't tell you.*"); *id.*, 119:18-120:3 (revealing he can only speculate as to whether any defendant knew the earlier provision of closed-toe shoes was necessary to prevent plantar fasciitis); *id.*, 163:5-15. ("*What risks did [Dr. Chen] know not giving you shoes would expose you*

*to? A: I'm going to object to being able to opinionate (sic) on her risk, on her knowing what risk it is.*"); *id.*, 119:5-13 ("*A: Did Dr. Tha know that not getting you shoes sooner would expose you to an excessive health risk? A: I would have to say she—she, being a medical doctor, had to know that . . . was effective, that it would be a problem. I ain't going to say she knew that it was going to affect me that way. But I will say that, being a medical doctor, she should have known.*").

"[M]ere . . . speculation [does] not create a factual dispute for purposes of summary judgment." *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted).

Finally, the record also showed that Plaintiff underwent diagnostic testing after his transfer to SQSP in November of 2015, and an SQSP physician noted x-rays reflected only "mild" arthritis in Plaintiff's left shoulder and "normal" results in his right and left knees. *See* Chung Decl., Ex. 1 at 1-3, 6-9. Even if Plaintiff claims he should have received different treatment and accommodations for his arthritis, again—a difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60. Again, although the medical treatment and accommodations Plaintiff received for his "mild" arthritis may not have been what he considered proper treatment, he presents no evidence that Defendants were deliberately indifferent to his serious medical needs. Lastly, even if the alleged proper course of treatment (i.e., the eventual granting of his requested accommodations) was delayed, this fact would only tend to prove negligence, which is insufficient to make out a violation of the Eighth Amendment. *See id.*

### C. Hernia Treatment and Surgical Referral

In his opposition, Plaintiff alleges that Defendants were deliberately indifferent by not referring him for a consult regarding possible hernia surgery, and by refusing to refill his pain medication. Dkt. 140-1 at 8-10. However, Plaintiff's medical history indicated Plaintiff had this small, inguinal hernia dating back to at least 2006. Magat Decl., Ex. A at 87. Defendants argue that because there were no signs of infection or strangulation, the hernia was appropriately treated with clinical monitoring (including pain medication) rather than surgical referral. Magat Decl. ¶ 14; Newell Decl. ¶ 6; Chen Decl. ¶ 12; Tha Decl. ¶ 11. Furthermore, Defendant Newell provided a hernia belt to alleviate discomfort. Newell Decl. ¶ 6; Tha Decl. ¶ 4; Pl.'s Depo., 81:20-

22 (reporting use of hernia belt "pretty much" every day). Defendants' declarations affirmatively indicate that Defendants Newell's and Tha's plan to proceed with conservative treatment met the standard of care. *See* Newell Decl. ¶ 13; Tha Decl. ¶ 11; Magat Decl. ¶ 14. The record shows that Plaintiff did not complain of any hernia-related issue during his interactions with Defendant Magat or Defendant Chen but, even if he had, undisputed expert opinion confirms not referring him for a consult regarding possible hernia surgery likewise would have met the standard of care. *See* Chen Decl. ¶ 12; Magat Decl. ¶¶ 13-14; Newell Decl. ¶ 13; Tha Decl. ¶¶ 11, 16. Furthermore, even though Plaintiff claims he *required* "emergency" hernia surgery, such a contrary lay opinion generates no genuine dispute. *See, e.g., Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) ("Eighth Amendment doctrine makes clear that '[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." (quotation marks omitted)). As mentioned above, Defendants Magat's medical opinion was that "[b]ased on [Plaintiff's] presentation and subjective report, no referral for possible hernia surgery was medically necessary." Magat Decl. ¶ 14. Defendants have also each have explained in their declarations that they perceived no hernia-related excessive risk. *See* Magat Decl. ¶¶ 13-14; Newell Decl. ¶¶ 6, 18; Chen Decl. ¶¶ 12, 19; Tha Decl. ¶¶ 4, 11, 16. In his deposition, Plaintiff fails to present any contrary evidence. *See, e.g.*, Pl.'s Depo., 98:5-13 (admitting that he did not know whether Dr. Newell knew of any purported medical risk implicated by a lack of hernia surgery).

Moreover, the record confirms that no such "emergency" need for hernia surgery existed because Plaintiff opted not to have hernia surgery prior to his incarceration at Santa Rita even though his hernia had developed many years prior—in 2006. *See* Magat Decl., Ex. A at 87. Similarly, after his transfer from Santa Rita to SQSP, Plaintiff indicated that wanted to have hernia surgery, but not before he was endorsed to a new facility. Chung Decl., Ex. 1 at 12. It seems that Plaintiff has remained at SQSP since his arrival in October 2015, and that he eventually had his hernia surgery on March 28, 2016 for "left inguinal hernia repair." Pl.'s Depo., 80:10-18; Dkt.

140, Ex. C at A-69.[32]  However, prior to the hernia surgery, the record shows that when he initially arrived at SQSP in October 2015, the medical providers at that prison, like those at Santa Rita, perceived no problem with continuing conservative treatment.  Chung Decl., Ex. 1 at 11.  As mentioned above, Dr. Tootell stated on November 25, 2015 that she: (1) concluded Plaintiff's small hernia "could be" repaired at the facility to which Plaintiff was transferred, "if that is what the next facility wants to do for him," and (2) continued with conservative treatment, i.e., over-the-counter NSAIDs" to treat his hernia.  *See id.*

Finally, Defendants argue that Plaintiff's theory of hernia-related indifference also is untenable as a matter of law due to the absence of a genuine dispute regarding causation.  Dkt. 124 at 20.  The Court agrees.  As a preliminary matter, any notion of any hernia-related harm would be at best speculative because no evidence suggests: (1) that any surgeon to whom any defendant may have referred Plaintiff actually would have performed surgery prior to Plaintiff's transfer from Santa Rita, or (2) that earlier hernia surgery would have resulted in a better outcome if such a hypothetical surgeon would have proceeded with surgical treatment.  Moreover, Defendants Chen and Magat necessarily were not a legal cause of any alleged harm because, not having been alerted to Plaintiff's hernia, they owed no duty or responsibility to attempt to prevent any risk of harm it supposedly entailed.  *See* Magat Decl. ¶ 13; Chen Decl. ¶ 12; *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (explaining causation must be assessed in light of a defendant's "duties and responsibilities").  Meanwhile, Defendants Newell similarly had no duty or responsibility to treat Plaintiff's hernia other than on October 27, 2014, when she recommended a hernia belt to alleviate any discomfort.  Magat Decl., Ex. A at 52-53.  Similarly, when Defendant Tha examined Plaintiff regarding his hernia, she noted that Plaintiff had a hernia belt to alleviate discomfort and determined that "[g]iven the comparatively minor nature of the hernia, the standard of care did not require surgical referral."  Magat. Decl., Ex. A at 59; Tha Decl. ¶ 4.  Thus, neither Defendant

---

[32] While Defendants dispute the authenticity of Plaintiff's exhibits, they do not dispute Plaintiff's claim that he had his hernia surgery on March 28, 2016.  Therefore, as mentioned above, the Court has denied as moot any motion to strike and objection they have to the medical records submitted by Plaintiff, including those documenting the March 28, 2016 hernia surgery. *See* Dkt. 140, Ex. C at A-69.

1    Newell nor Defendant Tha was the legal cause of any harm Plaintiff supposedly experienced due

2    to deficient care based on a failure to refer Plaintiff for hernia surgery.  *See* Newell Decl. ¶ 6; Tha

3    Decl. ¶ 11.

### D.    Shoulder and Clavicle Issues

5    In his opposition, Plaintiff claims that Defendants were deliberately indifferent to a

6    substantial risk of serious harm allegedly associated with a lack of an order for an x-ray, physical

7    therapy, or a surgical referral for an old clavicle fracture and/or shoulder joint separation that took

8    place prior to the time-frame at issue.  Dkt. 140-1 at 5-7.

9    As explained above, Plaintiff's medical records indicate that in December 2013, RN

10   Inocencio made a reference to Plaintiff's "old dislocation of the shoulder" resulting in a

11   "protrusion" of his right clavicle dislocation.  Magat Decl., Ex. A at 13.  However, RN Inocencio

12   noted that no referral was need and nothing in her notes showed that Plaintiff was in any acute

13   distress.  *Id.*  In his opposition, Plaintiff claims that on January 6, 2014, he submitted a medical

14   request to see a physical therapist for an x-ray of his "[C]ollar-bone (clavicle area)," and for pain

15   medication for his right shoulder.  Dkt. 140-1 at 6.  The record shows that on June 7, 2014,

16   Plaintiff refused to meet with PT Silveira.  Magat Decl., Ex. A at 18.  Nothing in the record shows

17   that Plaintiff made any other complaints about his shoulder and clavicle issues until he after he left

18   Santa Rita and discussed possible shoulder surgery with medical personnel at SQSP.  *See* Chung

19   Decl., Ex. 1 at 11-12.  For example, when Plaintiff met with PT Silveira on May 8, 2014, Plaintiff

20   only complained of hand numbness and did not mentioned any shoulder or clavicle issues.  *See*

21   Magat Decl., Ex. A at 86.  On March 26, 2014, Dr. Raina examined Plaintiff again for his

22   complaints of hand numbness and referred him to physical therapy.  *Id.* at 22.  However, again,

23   Plaintiff fails to mention any shoulder or clavicle issues.  *Id.*  Finally, on July 22, 2014, PT

24   Silveira discontinued further physical therapy visits because Plaintiff was "doing well with no new

25   complaints."  *Id.* at 39.

26   Defendants claim that Plaintiff did not ask them to address any shoulder or clavicle issues

27   (that required a surgical referral) during the times they met with him and examined him during the

28   time frame at issue.  *See* Magat Decl. ¶ 15; Chen Decl. ¶ 17; Newell Decl. ¶ 14; Tha Decl. ¶ 12;

31

*see also generally* Magat Decl., Exh. A. According to Defendant Newell, on September 29, 2014, Plaintiff complained of pain in his shoulders due to arthritis. Magat Decl., Ex. A at 46. However, Plaintiff did not raise any concerns about his old clavicle fracture and/or shoulder joint separation that took place in early 2013, and he did not request a surgical referral. *Id.*

As noted above, a prison official is deliberately indifferent under the subjective element of the applicable test only if the official "*knows of and disregards* an excessive risk to inmate health and safety." *Toguchi*, 391 F.3d at 1056 (emphasis added). Here, the record does not support such a finding. Rather, Defendants did *not* know of Plaintiff's alleged excessive clavicle or shoulder treatment-related risk. *See, e.g.*, Magat Decl. ¶ 15; Chen Decl. ¶ 17; Newell Decl. ¶ 14; Tha Decl. ¶12. Thus, it follows that Defendants could not have *disregarded* such a risk. Moreover, none of the numerous care providers who examined him at Santa Rita during the time frame at issue ordered any shoulder-related surgical consult. *See generally* Magat Decl., Ex. A. In his opposition, Plaintiff stated that he eventually obtained an x-ray and surgical consult relating to his shoulder at SQSP. Pl.'s Depo., 81: 4-6. He added that he was being "prepp[ed] for the shoulder surgery." *Id.* He claimed that SQSP medical staff was "getting ready" to do the shoulder surgery, but nothing in the record shows that such a surgery has taken place. *Id.*, 99:13-14. In contrast, the record shows that as of the date of his deposition, September 14, 2016—which is fourteen months after transferring to SQSP—Plaintiff still had not had the shoulder surgery he claimed was medically necessary. *Id.*

In his opposition, Plaintiff claims that Defendants acted with deliberate indifference when they "[d]elayed [him] access to x-rays and must needed surgical procedures, [w]hich inflicted unnecessary wanton pain, and health risks to [him] for the entire 23 months [he] was in [t]heir care." Dkt. 140-1 at 7. However, Plaintiff only makes *conclusory* allegations relating to Defendants' alleged deliberate indifference to a substantial risk of serious harm allegedly associated with a lack of an order for an x-ray, physical therapy, or a surgical referral for his shoulder or clavicle issues. *See* Dkt. 140-1 at 5-7. Conclusions masquerading as facts are insufficient to hold Defendants accountable. *See Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of

fact.") (citation omitted).

Although Plaintiff alleges that Defendants were responsible for the excessive delay in receiving treatment for his shoulder or clavicle issues, Plaintiff has failed to show that such a delay resulted in substantial harm. *See Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990) (delay of over a month in referring inmate to orthopedic specialist for removal of broken, free-floating pin in shoulder, during which time inmate complained of pain in shoulder, was not actionable because no substantial harm resulted); *cf. Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (delay of a year in providing knee surgery for inmate, resulting in serious aggravation of injury and permanent impairment, may be actionable). Had Defendants known that Plaintiff's shoulder or clavicle issues required emergency treatment, or that there was a substantial risk that Plaintiff's condition would worsen without receiving x-rays, physical therapy, and a surgical consult, such a delay might well deliberately indifferent. But Plaintiff fails to present evidence showing that he alerted Defendants of any resulting injury from the alleged delay.

Finally, the Court finds unavailing Plaintiff's apparent theory of Defendants' deliberate indifference to his shoulder or clavicle issues because no Defendant caused any harm to his shoulder or clavicle. *See* Magat Decl. ¶¶ 15, 18(d); Newell Decl. ¶¶ 14, 17(b); Chen Decl. ¶¶ 17-18(b); Tha Decl. ¶¶ 12, 16(d). As a preliminary matter, Defendants necessarily were not a legal cause of any such harm because they had no duty or responsibility to address the shoulder or clavicle issues Plaintiff now raises because such issues never were brought to their attention. Magat Decl. ¶ 15; Newell Decl. ¶ 14; Chen Decl. ¶ 17; Tha Decl. ¶ 12.

### E. Training

During the time frame at issue, Defendant Magat held the title of "Acting Medical Director." Dkt. 15 at 4. Plaintiff alleged that Defendant Magat failed to train or supervise properly the other Defendants, who are all physicians, to ensure they did not "delay or den[y] needed medical treatments." Dkt. 15-2 at 5. However, in her declaration, Defendant Magat claims she had "no duty or responsibility to provide medical training to the other Defendants," stating as follows:

> First, I had no duty or responsibility to provide medical training to the other physicians, who are licensed and have completed medical training. Second, I never had any information suggesting that anyone was delaying or denying Mr. Wilkins any necessary treatment. I thus never perceived any excessive health risk associated with Drs. Tha, Chen, and/or Newell's care. To the contrary, the records show that Mr. Wilkins' received extensive, conscientious treatment throughout his incarceration and that Drs. Tha, Chen and Newell invariably met the standard of care. Further, as the Medical Director at Santa Rita, I was available if other physicians wished to consult with me regarding treatment, but I had no duty or responsibility to second guess other physicians unless I received information suggesting second-guessing their decision-making might be indicated. In Mr. Wilkins's case, that did not occur.

Magat Decl. ¶ 17. Therefore, Plaintiff has failed to raise a triable issue of fact that Defendant Magat knew there was a delay in Plaintiff receiving treatment, or that she failed to train or supervise properly the other Defendants.

###### F. Summary

In sum, the Constitution does not require that Defendants provide Plaintiff with successful or perfect treatment. It requires only that Defendants do not act with deliberate indifference. As explained above, Defendants were aware of his conditions involving his skin issues, arthritis, and hernia, and they sought to treat it with appropriate measures. Meanwhile, they were *not* aware of Plaintiff's shoulder or clavicle issues and thus could not have acted with deliberate indifference for failing to order x-rays, physical therapy, and a surgical consult. Thus, Plaintiff has failed to carry his burden of raising a genuine issue of fact to support his claim that Defendants' actions rose to the level of deliberate indifference to his serious medical needs. Furthermore, Plaintiff has failed to raise a triable issue of fact that Defendant Magat knew there was a delay in Plaintiff receiving treatment, or that she failed to train or supervise properly the other Defendants. Accordingly, Defendants are entitled to summary judgment. Therefore, their second motion for summary judgment is GRANTED. Dkt. 124.

### V. CONCLUSION

For the foregoing reasons,

1.      Defendants' second motion for summary judgment is GRANTED,[33] and judgment

---

[33] The Court's finding that Defendants are entitled to summary judgment as to Plaintiff's

will be entered in their favor.  Dkt. 124.

       2.      Defendants' Objections to Putative Evidence and Request to Strike is DENIED as moot.  Dkt. 141.

       3.      The Clerk of the Court shall terminate all other pending motions as moot, including Plaintiff's motion for appointment of counsel (dkt. 142), and close the file.

       4.      This Order terminates Docket Nos. 124, 141 and 142.

       IT IS SO ORDERED.

Dated:  September 25, 2018

YVONNE GONZALEZ ROGERS
United States District Judge

---

Eighth Amendment claim obviates the need to address Defendants' alternative argument in their motion, including Plaintiff's failure to exhaust administrative remedies as to his claims relating to deficient shoulder, clavicle, or hernia-related care.  *See* Dkt. 124 at 22.

35